# United States Court of Appeals
## For the Eighth Circuit
_____

## Nos. 12-1702, 12-1705, 12-1708
_____

Fred H. Keller, Jr.; Juan Doe; Juana Doe #2

*Plaintiffs - Appellants/Cross Appellees*

v.

City of Fremont; Dale Shotkoski, in his Official Capacity; Timothy Mullen, in his Official Capacity

*Defendants - Appellees/Cross Appellants*

------------------------------

Mario Martinez, Jr.; Martin Mercado; Paula Mercado; Jane Doe; Maria Roe; Steven Dahl; ACLU Nebraska Foundation; United Food and Commercial Workers Union, Local 22; Blake Harper

*Plaintiffs - Appellants/Cross Appellees*

v.

City of Fremont; Dale Shotkoski, in his Official Capacity as Fremont City Attorney; Timothy Mullen, in his Official Capacity as Fremont Chief of Police

*Defendants - Appellees/Cross Appellants*

------------------------------

American Unity Legal Defense Fund; Eagle Forum Education and Legal Defense Fund

*Amici on Behalf of Appellees/Cross Appellants*

National Council of La Raza, Inc.; Justice for our Neighbors - Nebraska; National Fair Housing Alliance; The Major Cities Chiefs Association; The National Latino Peace Officers Association; United States of America; Fair Housing Center of Nebraska-Iowa; Apartment Association of Greater Omaha and Lincoln; Nebraska Appleseed Center for Law in the Public Interest; National Apartment Association

*Amici on Behalf of Appellants/Cross Appellees*[1]

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: December 13, 2012
Filed: June 28, 2013

_____

Before LOKEN, BRIGHT, and COLLOTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

In June 2010, voters in Fremont, Nebraska, adopted Ordinance No. 5165, which limits hiring and providing rental housing to "illegal aliens" and "unauthorized aliens," terms defined in the Ordinance. Two groups of landlords, tenants, and employers (collectively, "Plaintiffs," and separately, "the Keller Plaintiffs" and "the Martinez Plaintiffs") filed these actions in federal court to enjoin enforcement, contending that the Ordinance, on its face, is unconstitutional and violates federal and state laws. Ruling on cross-motions for summary judgment, the district court severed and enjoined enforcement of certain rental provisions, concluding they are preempted by the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, and violate

_____

[1]The "Apartment Association of Greater Omaha and Lincoln" and the "National Apartment Association" are not amici in Appeal No. 12-1708.

-2-

the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*. Keller v. City of Fremont, 853 F. Supp. 2d 959 (D. Neb. 2012). Both sides appeal. Reviewing these issues *de novo*, we reverse the district court's preemption and FHA rulings, affirm in all other respects, vacate the court's injunction, and remand with directions to dismiss Plaintiffs' complaints.

## I. Background

Located near Omaha, Fremont is a "city of the first class" with a population of approximately 26,000. See Neb. Rev. Stat. § 16-101. In recent years, as reflected in U.S. Census Bureau data, the City's Hispanic or Latino population nearly tripled, rising from 1,085 in 2000 (4.3% of the City's population) to 3,149 in 2010 (11.9%). According to the 2000 Census, Latinos then comprised about 80% of the City's foreign-born population. In a June 2010 special election, after the City Council declined to pass a nearly identical measure, voters adopted Ordinance No. 5165 amending the City's municipal code.

Shortly before the Ordinance was to take effect, Plaintiffs filed these facial challenges, later consolidated with the parties' consent. Plaintiffs alleged that the Ordinance is preempted by federal law; violates the Equal Protection, Due Process, and Commerce Clauses of the United States Constitution; violates the Fair Housing Act and 42 U.S.C. § 1981; and exceeds the City's municipal powers under Nebraska law. They initially sought preliminary as well as permanent injunctive relief. When the City Council passed a resolution not to enforce the Ordinance until 14 days after final decisions issue, Plaintiffs withdrew their preliminary injunction motions.

The Ordinance's employment provisions require "[e]very business entity . . . performing work within the City" to participate in the "E-Verify Program," a federal database that allows employers to verify the work-authorization status of prospective employees. This requirement does not apply to the hiring of independent contractors

or "to the intermittent hiring of casual labor for domestic tasks." Violators may lose their business licenses, permits, contracts, loans, or grants from the City. Relying on the Supreme Court's decision in Chamber of Commerce v. Whiting, 131 S. Ct. 1968 (2011), the district court concluded that this portion of the Ordinance is not preempted by federal law because it is "essentially a licensing or similar law" and thus falls within the savings clause in the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1324a(h)(2). Keller, 853 F. Supp. 2d at 971. Plaintiffs do not appeal this ruling.

The Ordinance's prospective rental provisions are the primary focus of these appeals. These provisions make it unlawful for any person or business entity to rent to, or permit occupancy by, "an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." An "illegal alien" is "an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, Section 1101 et seq." "The City shall not conclude that an individual is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, Section 1373(c), such individual's immigration status."

To implement this restriction, the Ordinance provides that prospective renters over the age of 18 must obtain an occupancy license from the City, and must obtain a new license if they move to different rental properties. Temporary guests need not obtain a license. To obtain a license, an applicant must pay a five-dollar fee and disclose basic identifying information, including citizenship and, if an alien,[2] immigration status. The City "shall immediately issue an occupancy license" upon receipt of a complete application. At this point, the renter may lease and occupy a

---

[2]The INA defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). Like the district court, we do not use the term pejoratively. See Keller, 853 F. Supp. 2d at 970 n.6.

rented dwelling unit. The lessor must obtain a copy of the renter's occupancy license. An alien renter who is subsequently determined to be not lawfully present in the United States "shall be deemed to have breached" the lease.

Promptly after issuance of the occupancy license, the Fremont Police Department must ask the federal government to verify the immigration status of an alien renter. If the federal government reports that the renter is "unlawfully present," the police send the renter a deficiency notice; the renter then has sixty days to establish lawful presence. If the renter fails to do so, the police must contact the federal government again to verify the renter's immigration status. If the federal government again reports that the renter is "unlawfully present," the police send the renter and the landlord a notice revoking the occupancy license, effective forty-five days later. Violators may be fined $100 per violation per day. Renters and landlords receiving deficiency notices may seek judicial review.

The district court rejected Plaintiffs' preemption challenge to the occupancy licensing requirement, finding no conflict between federal immigration law and provisions of the Ordinance requiring prospective renters to disclose immigration information and requiring the police to verify that information with federal authorities. However, the court concluded:

> To the extent that the Ordinance . . . provides penalties for the harboring of persons who have entered or remained in the United States in violation of law, or provides for the revocation of occupancy licenses and penalties for the lease or rental [of] dwelling units following the revocation of occupancy licenses, it conflicts with the INA, presenting an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Keller, 853 F. Supp. 2d at 972-73 (quotations omitted). The court also concluded that these preempted provisions, on their face, violate the FHA because they would have

an unlawful disparate impact on Latino residents.  Id. at 976-79.  Finally, applying Nebraska law, the court concluded that the unlawful provisions are severable from the remainder of the Ordinance and permanently enjoined their enforcement, but not the non-preempted rental provisions.[3]

Plaintiffs appeal, contending the court erred in not invalidating all of the Ordinance's rental provisions as federally preempted or, alternatively, as not properly severable from the unlawful provisions.  The Martinez Plaintiffs appeal the court's state law rulings and its conclusion that they did not plead disparate impact claims under the FHA.  The City cross appeals, arguing the court erred in concluding that any provision of the Ordinance is federally preempted or violates the FHA.

## II. Preemption

Four months after the district court's decision, the Supreme Court issued its decision in Arizona v. United States, 132 S. Ct. 2492 (2012), which significantly affects the issues before us on appeal.  The Court in Arizona considered a facial challenge to four sections of an Arizona law commonly referred to as S.B. 1070. Section 3 imposed state criminal sanctions for an alien's willful violation of *federal* alien registration laws.  Section 5(C) imposed criminal penalties on unauthorized aliens who seek work or work in Arizona.  Section 6 authorized state officers to arrest a person, without a warrant, if the officer has probable cause to believe the person "has committed any public offense that makes [him] removable from the United States."  Id. at 2505 (quotations omitted).  Section 2(B) required that state officers make a "reasonable attempt . . . to determine the immigration status of any person they stop, detain, or arrest on another legitimate basis if reasonable suspicion exists

---

[3]The district court rejected Plaintiffs' equal protection and due process claims, the Keller Plaintiffs' claims under § 1981 and the Commerce Clause, and the Martinez Plaintiffs' discriminatory treatment claims under the FHA.  Plaintiffs do not challenge these rulings on appeal.

that the person is an alien and is unlawfully present in the United States." Id. at 2507 (quotations omitted). The Court held the first three provisions, but not the fourth, preempted by the federal immigration laws.

Justice Kennedy's majority opinion began by reaffirming two powerful principles that govern these issues. First, the federal government "has broad, undoubted power over the subject of immigration and the status of aliens," authority that rests on the constitutional power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4, and on the national government's "inherent power as sovereign to control and conduct relations with foreign nations." Arizona, 132 S. Ct. at 2498. Second, by reason of the Supremacy Clause, Art. VI, cl. 2,[4] Congress has virtually unfettered power to preempt state laws (i) "by enacting a statute containing an express preemption provision," or (ii) by determining that "conduct in a field . . . must be regulated by its exclusive governance," preemption that may be inferred from the pervasiveness of a federal regulatory regime or from the dominance of the federal interest being regulated. Id. at 2500-2501. In addition, state laws are preempted when they conflict with federal law. Conflict preemption occurs when compliance with both federal and state laws is impossible, and when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. at 2501 (quotations omitted).[5]

Turning to the Arizona provisions at issue, the Court first invalidated § 3 as an impermissible intrusion on the exclusively federal field of alien registration, relying

---

[4]"This Constitution, and the Laws of the United States . . . made in Pursuance thereof; and all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

[5]"[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985).

heavily on its prior decision in Hines v. Davidowitz, 312 U.S. 52, 59-60, 74 (1941), that struck down a parallel Pennsylvania registration law. Arizona, 132 S. Ct. at 2501-03. Second, the Court concluded that § 5(C) "would interfere with the careful balance struck by Congress" when it chose in the federal statute "not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment." Id. at 2504-05. Third, the Court invalidated § 6, the warrantless arrest provision, emphasizing the importance of federal discretion in the alien removal process and the "significant complexities" in determining whether an alien is removable. Id. at 2506. Finally, the Court declined to sustain the facial challenge to the requirement in § 2(B) that state officers make a reasonable attempt to determine the immigration status of any person they detain or arrest if they have reasonable suspicion that "the person is an alien and is unlawfully present in the United States," id. at 2507, concluding that prolonged detention for this purpose was not inevitable and "it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law," id. at 2510.

Plaintiffs argue that the Ordinance's rental provisions are federally preempted under all of the above-summarized preemption doctrines. In our view, the only serious issue on this summary judgment record is conflict preemption, whether these provisions "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in providing exclusively federal procedures for removing aliens unlawfully present in this country in the INA, as the district court concluded and the United States argues as Amicus Curiae. Before addressing that issue, we will explain why Plaintiffs' broader preemption arguments are unsound.

A. Exclusive Federal Power To Admit and Remove Aliens. In De Canas v. Bica, 424 U.S. 351, 356 (1976), the Supreme Court addressed the extent to which the Constitution preempts state and local laws, in which case "Congress itself would be powerless to authorize or approve" such laws. The issue in De Canas was whether a California law imposing fines on employers who knowingly employed unlawfully

present aliens was an unconstitutional attempt by the State to regulate immigration. As the Court framed the issue:

> Power to regulate immigration is unquestionably exclusively a federal power. But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power, whether latent or exercised. . . . [T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.

424 U.S. at 354-55 (citations omitted). While acknowledging that the California law may have some "indirect impact on immigration," the Court held that it was not constitutionally preempted. Id. at 355-56.

Relying on De Canas, Plaintiffs argue the rental provisions are constitutionally preempted because they have the impermissible effect of regulating immigration by expelling from the City aliens who are not lawfully present in the United States.[6] Alternatively, Plaintiffs contend, the rental provisions intrude on a federally occupied "field," alien removal, which is exclusively governed by complex removal procedures prescribed by Congress in the INA. See 8 U.S.C. § 1229a. These related arguments are premised on the notion that the rental provisions impermissibly "remove" a class of aliens from the City. But the premise is false; these provisions neither determine "who should or should not be admitted into the country," nor do they more than marginally affect "the conditions under which a legal entrant may remain." De Canas, 424 U.S. at 355. Indeed, Plaintiffs' assertion is factually unsupported, as there

---

[6]Plaintiffs' constitutional argument is historically unsound. "In light of the predominance of federal immigration restrictions in modern times, it is easy to lose sight of the States' traditional role in regulating immigration -- and to overlook their sovereign prerogative to do so." Arizona, 132 S. Ct. at 2514 (Scalia, J., dissenting).

is no record evidence that aliens denied occupancy licenses in the City will likely leave the country, as opposed to obtaining other housing in the City, renting outside the City, or relocating to other parts of the country.

Laws designed to deter, or even prohibit, unlawfully present aliens from residing within *a particular locality* are not tantamount to immigration laws establishing who may enter or remain in the country. Indeed, Plaintiffs' expansive notion of constitutional and field preemption is contrary to decisions of the Supreme Court expressly recognizing that a State may enact an otherwise valid law[7] that deters unlawfully present aliens from residing within the State, notwithstanding the federal government's exclusive power in controlling the nation's borders. As the Court explained in Plyler v. Doe:

> Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service. Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns.

457 U.S. 202, 228 n.23 (1982); see De Canas, 424 U.S. at 355-56.

Plaintiffs' broad definition of "regulation of immigration" is also inconsistent with the Court's decision in Whiting, 131 S. Ct. at 1987, upholding an Arizona law

---

[7]Of course, such legislation is subject to other constitutional challenges, such as whether "there is no rational basis for the difference in treatment" of similarly situated persons, an issue that is not before us. Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); see City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446 (1985).

-10-

that mandated the use of E-Verify and revoked the licenses of employers who knowingly employed aliens lacking work authorization. The Court gave no hint that the Arizona law constituted impermissible state regulation of immigration because it may have the effect of driving certain classes of aliens from the State. Instead, the Court carefully analyzed whether the Arizona law was either expressly preempted by IRCA, or was impliedly preempted because it conflicted with federal law. Id. at 1977-84. This analysis would have been unnecessary if the Arizona law was "a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." De Canas, 424 U.S. at 356.

We reject Plaintiffs' broad contentions as contrary to controlling Supreme Court precedents and as an intrusion on the power of Congress to define appropriate limits on state and local laws that may affect the exclusive federal legislative power "[t]o establish an uniform Rule of Naturalization." Art. I, § 8, cl. 4. On this issue, we disagree with a pair of now-vacated panel decisions of our sister circuits, Lozano v. City of Hazleton, 620 F.3d 170, 220-21 (3d Cir. 2010), vacated and remanded in light of Whiting, 131 S. Ct. 2958 (2011), and Villas at Parkside Partners v. City of Farmers Branch, 675 F.3d 802, 813 (5th Cir.), vacated for reh'g en banc, 688 F.3d 801 (5th Cir. 2012). The rental provisions do not remove aliens from this country (or even the City), nor do they create a parallel local process to determine an alien's removability. Accordingly, they do not regulate immigration generally or conduct in the "field" of alien removal. We are unwilling to speculate whether other state and local governments would adopt similar measures, whether those measures would survive non-preemption challenges, and the impact of any such trend on federal immigration policies. One thing is clear -- Congress could put an end to any such practice, widespread or not, by exercising its express preemption powers. See Arizona, 132 S. Ct. at 2500-01. It would be inconsistent with Congress's Article I powers if the judiciary assumed for itself this broad preemption power.

-11-

B. Other Field Preemption Assertions. Plaintiffs argue the Ordinance's rental provisions are also preempted by federal legislation that wholly occupies two other fields, alien registration and "anti-harboring." In considering these issues, we must bear in mind the Supreme Court's caution in De Canas: "Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution." 424 U.S. at 360 n.8 (quotations omitted).

1. Alien Registration. In Hines, 312 U.S. at 70, 74, the Supreme Court held that the "complete system for alien registration" enacted by Congress in 1940 preempted Pennsylvania's parallel registration regime because Congress intended to create "a single integrated and all-embracing system" for alien registration. In Arizona, relying on Hines, the Court invalidated § 3 of the Arizona law, which imposed state criminal sanctions for an alien's willful violation of federal alien registration laws, because, "[w]here Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible." 132 S. Ct. at 2502. Plaintiffs argue the Ordinance's occupancy licensing scheme is likewise a completely field-preempted alien registration regime. We disagree.

The occupancy license scheme at issue is nothing like the state registration laws invalidated in Hines and in Arizona. The Ordinance requires *all* renters, including U.S. citizens and nationals, to obtain an occupancy license before renting a dwelling unit in the City. It does not apply to all aliens -- it excludes non-renters. Although prospective renters must disclose some of the same information that aliens must disclose in complying with federal alien registration laws, that does not turn a local property licensing program into a preempted alien registration regime. To hold otherwise would mean that any time a State collects basic information from its residents, including aliens -- such as before issuing driver's licenses -- it impermissibly intrudes into the field of alien registration and must be preempted. It defies common sense to think that Congress intended such a result.

-12-

2. Anti-Harboring. The federal immigration laws impose criminal penalties on any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection . . . such alien in any place, including any building or any means of transportation." 8 U.S.C. § 1324(a)(1)(A)(iii). Plaintiffs contend that, because the Ordinance makes it unlawful for a landlord "to harbor an illegal alien" in a dwelling unit "unless such harboring is otherwise expressly permitted by federal law," the Ordinance impermissibly intrudes upon a preempted anti-harboring "field." Again, we disagree.

The doctrine of field preemption is not nearly so expansive. "Only a demonstration that complete ouster of state power -- including state power to promulgate laws not in conflict with federal laws -- was the clear and manifest purpose of Congress would justify th[e] conclusion" that Congress "intended to oust state authority to regulate . . . in a manner consistent with pertinent federal laws." De Canas, 424 U.S. at 357 (quotations omitted). We find nothing in an anti-harboring prohibition contained in one sub-part of one subsection of 8 U.S.C. § 1324 that establishes a "framework of regulation so pervasive . . . that Congress left no room for the States to supplement it," or evinces "a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Arizona, 132 S. Ct. at 2501 (quotations omitted).

Plaintiffs also contend that the rental provisions conflict with the federal anti-harboring prohibition in 8 U.S.C. § 1324(a)(1)(A)(iii), by establishing a prohibition that defines "harboring" more expansively and imposes penalties not imposed by the federal statute. Congress has not preempted use of the word "harboring." That the Ordinance labels conduct it prohibits "harboring" says nothing about whether the prohibition conflicts with a federal criminal statute that uses the same word. Unlike § 5(C) of the Arizona statute the Court invalidated in Arizona, the Ordinance does not purport to enforce the federal anti-harboring prohibition. Rather, it prohibits

-13-

"harboring" conduct that is inconsistent with the City's local public interests, being careful not to prohibit conduct "expressly permitted by federal law." Plaintiffs made no showing that Congress intended to preempt States and local governments from imposing different penalties for the violation of different state or local prohibitions simply because the prohibited conduct is labeled "harboring."

C. Conflict Preemption. This brings us to the crux of the preemption issue, the contention of Plaintiffs and the United States that the rental provisions interfere with "a principal feature of the [federal] removal system," the broad discretion exercised by immigration officials to determine which aliens who are not legally present in the United States should be removed from the country. Arizona, 132 S. Ct. at 2499. The district court agreed in part with this contention, concluding:

> Once an individual is identified to federal authorities as an alien present in this country, the INA and federal regulations . . . provide the structure for the individual's classification and/or removal. If states or political subdivisions take independent action to remove aliens from their jurisdiction, essentially forcing them from one state or community to another where their identity and whereabouts may be obscured, the structure Congress has established for the . . . potential removal of aliens will be impaired.

853 F. Supp. 2d at 973. As the Ordinance's rental provisions would only indirectly effect the "removal" of any alien from the City, this reasoning is far too broad. It would apply equally to the California law upheld in De Canas and the Arizona law upheld in Whiting, because denying aliens employment inevitably has the effect of "removing" some of them from the State. See Truax v. Raich, 239 U.S. 33, 42 (1915) ("In ordinary cases [aliens] cannot live where they cannot work."). Conflict preemption analysis requires far greater specificity.

-14-

Plaintiffs' conflict preemption argument suffers from the same infirmity. As the rental provisions do not "remove" any alien from the United States (or even from the City), federal immigration officials retain complete discretion to decide whether and when to pursue removal proceedings. Unlike § 6 of the state law invalidated in Arizona, the rental provisions do not require local officials to determine whether an alien is removable from the United States -- a determination that involves "significant complexities." 132 S. Ct. at 2506. Indeed, the rental provisions expressly require City officials to defer to the federal government's determination of whether an alien renter is unlawfully present.[8] The Ordinance's deference to federal determinations of immigration status "mirrors the statutory language approved in Whiting." Farmers Branch, 675 F.3d at 830 (Elrod, J., dissenting in part); see Whiting, 131 S. Ct. at 1981 (plurality opinion in this Part).

The United States argues that a provision "such as that enacted by Fremont would undermine the orderly operation of federal removal proceedings by depriving aliens of shelter while federal officials determine whether to institute removal proceedings, and while such proceedings take place," and that "Fremont's Ordinance rests on the unsound assumption that the Police Department and state courts will be able to determine who can lawfully remain in the country in advance of and without regard to determination in a federal removal proceeding." Like Plaintiffs, the United States constructs its argument on the false premise that the Ordinance creates a competing regime to determine which aliens will be removed from the country. Having woven this straw man, it is of course easy to blow him down.

---

[8]Section 1.4(C) of the Ordinance provides that, after submitting an alien's occupancy license information to the federal government, "the [Police] Department shall take no further action until final ascertainment of the immigration status of the occupant is received from the federal government. The Department shall not attempt to make an independent determination of any occupant's immigration status."

The parties and the United States speculate inconclusively about the extent to which the Ordinance as applied would impermissibly interfere with the federal regulation of alien removal. Plaintiffs argue the rental provisions would expel from the City unlawfully present aliens who have pending applications to obtain lawful status, such as those seeking asylum, who may even be eligible for work authorization. The City responds that aliens who have pending applications for asylum and other forms of relief will not have their occupancy licenses revoked because they will be deemed by federal authorities to be "lawfully present." Plaintiffs and the government reply that, because an alien's immigration status is fluid, the federal government will not be able to tell the City whether an alien is "unlawfully present." The City contends that, pursuant to 8 U.S.C. § 1373(c),[9] federal authorities will be able to tell the City whether an alien is lawfully present. The record does not clarify how the government would respond to requests by the City under § 1373(c), and counsel at oral argument could not answer our requests for specific guidance. It seems obvious that, if the federal government will be unable to definitively report that an alien is "unlawfully present," then the rental provisions are simply ineffectual. Plaintiffs and the United States do not explain why a local law is conflict-preempted when the federal government has complete power to avoid the conflict.

These fact-intensive issues illustrate why facial challenges are disfavored and, accordingly, why Plaintiffs' facial challenge must fail. In Arizona, the Supreme Court dismissed a facial attack on § 2(B) of the state law, rejecting the argument that § 2(B) would inevitably require state officers to prolong detention for the sole purpose of verifying a detainee's immigration status:

---

[9]Section 1373(c) requires the federal government to "respond to an inquiry by a . . . State[] or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

-16-

The nature and timing of this case counsel caution in evaluating the validity of § 2(B). . . . There is a basic uncertainty about what the law means and how it will be enforced. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law.

Id. at 2510. This case presents an analogous situation. Before the rental provisions have been construed and implemented by state and local officials, and before we know how federal authorities will respond to the City's inquiries under § 1373(c), we decline to speculate whether the rental provisions might, as applied, "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as reflected in the complex removal provisions of federal immigration law. Id. at 2501 (quotations omitted). "In determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Wash. State Grange v. Wash. State Rep. Party, 552 U.S. 442, 449-50 (2008).

For these reasons, we conclude that Plaintiffs have failed to establish that any of the Ordinance's rental provisions are facially preempted by federal law. In so holding, we obviously express no opinion as to the wisdom of these provisions as a matter of federal, state, or local public policy.

### III. Fair Housing Act

The district court rejected Plaintiffs' FHA disparate treatment claims because they failed to prove the requisite intent to discriminate against Latinos. No party appeals that ruling. The court held that the Martinez Plaintiffs failed to assert a FHA disparate impact claim; they appeal that ruling. The court held that the Keller Plaintiffs have standing to assert a FHA disparate impact claim and upheld that claim

as to the rental provisions the court also concluded are federally preempted.  The City appeals both those rulings.

A.  The Martinez Plaintiffs.  After the district court entered final judgment, the Martinez Plaintiffs filed a motion to amend the judgment to reflect that they too prevailed on a disparate impact theory.  Rule 60(a) of the Federal Rules of Civil Procedure allows a court "to correct a clerical mistake or a mistake arising from oversight or omission."  The district court denied the motion, concluding "that the Martinez plaintiffs did not plead [a disparate impact] claim and are not prevailing parties on that claim."  The Martinez Plaintiffs appeal that ruling, which we review for abuse of discretion.  See Alpern v. Utilicorp United, Inc., 84 F.3d 1525, 1539 (8th Cir. 1996).  The Martinez Plaintiffs' Third Amended Complaint simply alleged: "The Immigration Ordinance violates the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, because it discriminates on the basis of race and/or national origin."  Unlike the Keller Plaintiffs,[10] they did not allege a disparate impact claim, nor did they allege sufficient *facts* to support a disparate impact theory.  After careful review of the record pertaining to this issue, we conclude the district court did not abuse its discretion in denying the Martinez Plaintiffs' motion to correct their "oversight or omission" in failing to plead a distinct Fair Housing Act claim.  See Kocher v. Dow Chemical Co., 132 F.3d 1225, 1229 (8th Cir. 1997); cf. Gregory v. Dillard's, Inc., 565 F.3d 464, 473 (8th Cir.) (en banc) ("A district court . . . is not required 'to divine the litigant's intent and create claims that are not clearly raised.'"), cert. denied, 130 S. Ct. 628 (2009).

B.  The Keller Plaintiffs.  Of the six original Keller Plaintiffs, three remain: Fred Keller, a landlord with rental properties in the City; Juan Doe, an alien with

---

[10]The Keller Plaintiffs' First Amended Complaint alleges that "[b]y enacting the Ordinance, Defendants have imposed terms and conditions on the rental of housing in the City that has a disproportionate negative impact on Latinos in violation of the federal Fair Housing Act."

Temporary Protected Status whose wife is an alien without lawful status and who rents month-to-month in the City; and Juana Doe #2, an alien without lawful status who now lives in a mobile home she purchased. In the district court, the City argued that no Keller plaintiff has standing to assert an FHA disparate impact claim and thus the district court lacked jurisdiction to grant relief on those claims. As to plaintiff Keller, plaintiffs responded that he has standing to assert Supremacy Clause and Commerce Clause challenges to the harboring and occupancy licensing provisions. The district court ruled more broadly: "the Court has undertaken an independent analysis and is satisfied . . . that each Plaintiff has standing to assert the claims presented by that Plaintiff." 853 F. Supp. 2d at 966-67 n.2. The court then stated, consistent with the Keller Plaintiffs' First Amended Complaint: "Plaintiffs in the Keller case" -- who obviously include landlord Keller -- assert "that the Ordinance has a disparate negative *impact* on Latino residents." Id. at 978 (emphasis in original).

On appeal, the parties argue at length whether Juan Doe and Juana Doe #2 have Article III standing to assert FHA disparate impact claims. But as to landlord Keller, the City, after conceding he "has standing to raise most of the preemption claims asserted," simply asserts without analysis or citation to authority that Keller, "a United States citizen landlord -- obviously lacks standing to bring" a disparate impact claim. We cannot agree.

To satisfy Article III standing requirements and thereby show that an actual case or controversy exists, "the party must show it has suffered some actual or threatened injury that can be traced to the allegedly illegal conduct and that is capable of being redressed." Nat'l Fed'n of the Blind of Mo. v. Cross, 184 F.3d 973, 979 (8th Cir. 1999). The injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (quotations omitted). Because Congress intended standing under the remedial provisions of the Fair Housing Act "to extend to the full limits" of Article III, courts

-19-

lack authority to create additional, prudential barriers to standing. Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (quotations omitted). Thus, so long as Keller has Article III standing, he may assert the rights of third parties in seeking to redress the injury to his own rights and interests.

"A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." Davis v. Fed. Election Comm'n, 128 S. Ct. 2759, 2769 (2008). When a state or local law imposes compliance burdens on those it regulates or controls, and "compliance is coerced by the threat of enforcement . . . the controversy is both immediate and real." Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 508 (1972). Therefore, "[p]laintiffs have standing to challenge the facial validity of a regulation notwithstanding the pre-enforcement nature of a lawsuit, where the impact of the regulation is direct and immediate and they allege an actual, well-founded fear that the law will be enforced against them." Gray v. City of Valley Park, 567 F.3d 976, 984 (8th Cir. 2009).

Here, the Ordinance's rental and harboring provisions are directly targeted at landlords. Keller testified that he has rented to aliens, does not inquire whether his tenants are lawfully in this country, but has been told that one or two were unlawfully present. If these provisions went into effect and Keller continued to be a City landlord,[11] he would be subject to the harboring proscription, could not rent dwelling units without obtaining copies of occupancy licenses from each occupant, and would be compelled to implement revocation notices received from the Fremont Police Department. Violations would subject Keller to criminal prosecution, and the restrictions would likely cause him to lose some tenants and restrict the pool of prospective tenants, causing economic injury. We therefore agree with the district

---

[11]Keller testified at his deposition that he would sell his properties if the Ordinance were found to be valid. That he may cease being a landlord if he were to lose the litigation does not affect whether he has constitutional standing to challenge the validity of the law before it is enforced against him.

court that Keller will suffer sufficient concrete and imminent future injury to give him Article III standing to assert a pre-enforcement facial challenge to these provisions under the FHA as well as the Supremacy Clause. Accord Lozano, 620 F.3d at 188-90. "When government action . . . is challenged by a party who is a target or object of that action . . . there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it." Minn. Citizens Concerned for Life v. Fed. Election Comm'n, 113 F.3d 129, 131 (8th Cir. 1997) (quotation omitted).

As one of the Keller Plaintiffs has Article III standing to assert an FHA disparate impact claim, we have jurisdiction to consider the merits and need not consider the difficult question whether Juan Doe and Juana Doe #2 would also have standing to assert this facial challenge.[12]

C. The Merits. The City argues the district court erred in concluding that the Ordinance's rental provisions violate the FHA because of their unlawful disparate impact on Latinos. Like most circuits, we have long recognized a disparate impact cause of action under the FHA in which "the plaintiff need prove no more than that the conduct of the defendant actually or predictably . . . has a discriminatory effect."

---

[12]Juan Doe and his wife have lived in their current rented residence for four years. His declaration that he is "currently looking to rent a house," contrary to his prior deposition testimony, may be too speculative to confer Article III standing. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983). Juana Doe #2's claims for injunctive relief are moot because she has moved from a rented apartment into a purchased mobile home and testified that she planned to live in that home indefinitely. Thus, the Ordinance's rental provisions may lack the requisite "high degree of immediacy." Lujan, 504 U.S. at 564 n.2. "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Friends of the Earth, Inc. v. Laidlaw Environ. Servs., 528 U.S. 167, 189 (2000) (quotations omitted).

-21-

United States v. City of Black Jack, 508 F.2d 1179, 1184 (8th Cir. 1974).  But the Supreme Court expressly declined to rule on this issue in Town of Huntington v. Huntington Branch, NAACP, 488 U.S. 15, 18 (1988) (per curiam), and today there is reason to doubt whether the Court would approve *any* disparate impact cause of action under the FHA.  See Gallagher v. Magner, 619 F.3d 823 (8th Cir.), reh'g en banc denied, 636 F.3d 380, 383-84 (8th Cir. 2010) (Colloton, J., dissenting), cert. granted, 132 S. Ct. 548 (2011), cert. dismissed, 132 S. Ct. 1306 (2012); Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly, 658 F.3d 375 (3d Cir. 2011), cert. granted, --- S. Ct. ----, 2013 WL 2922132 (June 17, 2013).

In this circuit, to prove a disparate impact violation of the FHA, a plaintiff must first establish a prima facie case, that is, "that the objected-to action results in, or can be predicted to result in, a disparate impact upon a protected class compared to a relevant population as a whole."  Charleston Hous. Auth. v. U.S. Dept. of Agric., 419 F.3d 729, 740-41 (8th Cir. 2005).  The Keller Plaintiffs identify a protected class, Latinos.  But they fail to identify a specific disparate impact, simply referring to the likelihood "that enforcing the Ordinance would result in  a reduction of the Hispanic population in Fremont."   And they make no attempt to identify the "relevant population" to be compared, other than citing statistics showing that a large number of the City's foreign-born population came from Latin American countries.  Is the relevant comparison the Ordinance's impact on all aliens not lawfully present, on all aliens, on all renters, or on the City's entire population?  The Keller Plaintiffs do not tell us, and their conclusory analysis of the issue provides no answer.

In our view, the issue is of great importance.  The FHA "was passed pursuant to congressional power under the Thirteenth Amendment to eliminate the badges and incidents of slavery."  Black Jack, 508 F.2d at 1184.  It is obviously consistent with this purpose to condemn an ordinance or practice that is neutral on its face but has the effect of perpetuating or reestablishing racially segregated communities or neighborhoods.  But a state law or local ordinance that restricts or disadvantages

-22-

aliens not lawfully present in the country has no such historic ties to the purposes of the FHA. We find no hint in the FHA's history and purpose that such a law or ordinance, *which is valid in all other respects*, violates the FHA if local statistics can be gathered to show that a disproportionate number of the adversely affected aliens are members of a particular ethnic group. In most cases today, that would of course be Latinos, but at various times in our history, and in various locales, the "disparate impact" might have been on immigrants from Ireland, Germany, Scandinavia, Italy, China, or other parts of the world. It would be illogical to impose FHA disparate impact liability based on the effect an otherwise lawful ordinance may have on a sub-group of the unprotected class of aliens not lawfully present in this country. Cf. Espinoza v. Farah Mfg. Co., 414 U.S. 86 (1973). Whatever its statutory merit in other contexts, the cause of action urged by the Keller Plaintiffs is unsound.

This conclusion is reinforced when we consider the other two elements of a disparate impact claim under the FHA: whether the City can show that "its policy or practice had manifest relationship to a legitimate, non-discriminatory policy objective and was necessary to the attainment of that objective," and if so whether plaintiffs can show that "a viable alternative means was available to achieve the legitimate policy objective without discriminatory effects." Gallagher, 619 F.3d at 834 (quotations omitted). The Keller Plaintiffs argue the City has failed to prove that the rental provisions are necessary to accomplish the policy objectives of "decreasing the fiscal burdens supposedly imposed by undocumented immigrants, as well [as] the crimes committed by illegal aliens." But as our preemption decision makes clear, cities and municipalities may have both a legitimate local interest in restricting the number of unlawfully present aliens residing within their borders and a rational basis for enforcing a particular restriction. If a particular means of achieving *this* legitimate policy objective survives preemption and other attacks on its constitutionality, the Keller Plaintiffs cannot identify "a viable alternative means" that would not have the same "discriminatory" effect and disparate impact on the portion of unlawfully present aliens who are Latino.

-23-

For these reasons, the Keller Plaintiffs' FHA claims of unlawful disparate impact must be dismissed.

## IV. State Law Claims

Early in the litigation, after conferring with the parties, the district court certified the following question to the Supreme Court of Nebraska:

> May a Nebraska city of the first class, that is not a "home rule" city under Article XI of the Nebraska Constitution and has not passed a home rule charter, promulgate an ordinance placing conditions on persons' eligibility to occupy dwellings, landlords' ability to rent dwellings, or business owners' authority to hire and employ workers, consistent with Chapters 16, 18, and 19 of the Revised Statutes of Nebraska?

Keller, 853 F. Supp. 2d at 979. The Nebraska Supreme Court denied certification, noting that, in exercising police power delegated by the State, "the municipal legislature, within constitutional limits, is the sole judge as to what laws should be enacted for the welfare of the people," and that the certified question did not "identify any state statutes or state constitutional provisions that were allegedly violated in the plaintiffs' complaints." Keller v. City of Fremont, 790 N.W.2d 711, 712-13 (Neb. 2010) (quotations omitted). In its subsequent summary judgment ruling, the district court rejected Plaintiffs' claim "that the Ordinance is void as a matter of state law," concluding that the Nebraska Legislature has delegated very broad statutory police powers to cities of the first class such as Fremont, without regard to whether they have adopted a home rule charter under Article XI of the Nebraska Constitution. Keller, 853 F. Supp. 2d at 980 & n.12; see Neb. Rev. Stat. § 16-246 ("A city of the first class may make all such ordinances, bylaws, rules, regulations, and resolutions not inconsistent with the general laws of the state as may be necessary or expedient . . . for maintaining the peace, good government, and welfare of the city.")

On appeal, the Martinez Plaintiffs first argue that the Ordinance is beyond the City's police power because it "does not involve a matter of purely local concern." This contention is without merit. Under Nebraska law, when there is a conflict between a state law and a provision of a city's home rule charter, "a provision of a home rule charter takes precedence over a conflicting state statute in instances of local municipal concern, but when the Legislature enacts a law affecting municipal affairs which is of state-wide concern, the state law takes precedence over any municipal action taken under the home rule charter." Jacobberger v. Terry, 320 N.W.2d 903, 905 (Neb. 1982) (quotations omitted); see also Axberg v. City of Lincoln, 2 N.W.2d 613, 615 (Neb. 1942). But these cases have no application here because Fremont has no home rule charter. As the above-quoted statement by the Supreme Court of Nebraska in Keller makes clear, the City has been delegated broad police power to enact ordinances "not inconsistent with the general laws of the state." Neb. Rev. Stat. § 16-246. Not surprisingly, the Martinez Plaintiffs cite no Nebraska case in which an ordinance by a city without a home rule charter was invalidated solely on the ground that it did not regulate "a matter of purely local concern."

The Martinez Plaintiffs next argue what was not alleged in their complaint and therefore not presented to the Supreme Court of Nebraska in the certified question -- that specific Nebraska statutes conflict with, and therefore preempt, one or more provisions of the Ordinance. First, they contend that the requirement in § 1.5(E) of the Ordinance that "[e]very business entity . . . performing work within the City shall register in the E-Verify Program" is "inconsistent with the general laws of the state" because the Nebraska Legislature in 2009 declined to impose this requirement statewide, opting instead to require only public entities and contractors to enroll in E-Verify. See Neb. Rev. Stat. § 4-114(2). Second, they contend that requiring prospective renters to disclose their "country or citizenship" to obtain an occupancy license constitutes an unlawful "written or oral inquiry or record concerning the . . . national origin . . . of a person seeking to . . . rent, or lease any housing" in violation of the Nebraska Fair Housing Act. See Neb. Rev. Stat. § 20-318(5).

"[A] municipal ordinance is preempted to the extent that it actually conflicts with state law." State ex rel. City of Alma v. Furnas Cnty. Farms, 667 N.W.2d 512, 522 (Neb. 2003). "When reviewing preemption claims, the court is obligated to harmonize, to the extent it legally can be done, state and municipal enactments on the identical subject. When an ordinance is susceptible of two constructions, under one of which it is clearly valid, while under the other its validity may be doubtful, that construction which makes the ordinance clearly valid will be given." Id. at 521-22 (citations omitted).

Applying this standard to the relatively barren record before us, we conclude that the Martinez Plaintiffs failed to prove their belated claims of actual conflict. That the Legislature does not require all employers in the State to use E-Verify does not imply that it intended to prohibit an individual municipality from enacting this requirement to promote the public welfare within its own borders. Indeed, as the City notes, the statute on which Plaintiffs rely to establish implied conflict specifically "encourag[es] the use of the federal immigration verification system" by private employers. Neb. Rev. Stat. § 4-114(3). Likewise, requiring prospective renters to disclose their "country or citizenship" does not necessarily require disclosure of national origin in a manner that would violate the state Fair Housing Act. On this pre-enforcement record, with no input from the relevant state housing officials and no evidence as to the specific disclosure that will be required, a reviewing court's "obligat[ion] to harmonize" precludes a ruling that the Fair Housing Act and the Ordinance's occupancy licensing requirements are in actual conflict. Of course, the validity of the Ordinance under state law is a question peculiarly within the province of the state courts. Our decision does not foreclose a future challenge on a more complete record in state court.

For these reasons, we reverse the district court's rulings that certain of the rental provisions are preempted by federal law and violate the FHA, and we affirm

in all other respects. The injunction is vacated, and the case is remanded with directions to dismiss the Keller Plaintiffs' and the Martinez Plaintiffs' complaints.

COLLOTON, Circuit Judge, concurring in part and concurring in the judgment.

I join Parts I, II, III.A, and IV of the opinion of the court. With respect to the Keller Plaintiffs and the Fair Housing Act ("FHA"), as addressed in Parts III.B and III.C of the lead opinion, I conclude that Fred Keller never asserted standing to raise a claim under the FHA, and it is not our place to raise that claim for him *sua sponte*. Juan Doe and Juana Doe #2 lack standing under Article III of the Constitution to pursue an FHA claim, because they have not established the requisite injury in fact. I therefore agree that the FHA claims of the Keller Plaintiffs should be dismissed, and I concur in the judgment directing the dismissal of both complaints.

Although the City of Fremont argued in the district court and on appeal that the Keller Plaintiffs lacked standing to bring a claim under the FHA, Fred Keller never claimed to have standing to do so. In response to the City's motion for summary judgment, which argued that Fred Keller, Juan Doe, and Juana Doe lacked standing to bring any claims, the Keller Plaintiffs responded as follows: (1) "Plaintiff Fred Keller has Standing to Raise his Claims Under the Supremacy Clause and the Commerce Clause of the U.S. Constitution;" (2) "Plaintiff Juan Doe has Standing to Raise his Claims under the Supremacy Clause, the Equal Protection Clause, Section 1981, and the Fair Housing Act;" and (3) "Plaintiff Juana Doe #2 has Standing to Raise her Claims Under the Supremacy Clause, the Equal Protection Clause, Section 1981, and the Fair Housing Act." R. Doc. 186, at 14, 17, 19. The plain import of this response is that Juan Doe and Juana Doe #2 were raising a claim under the Fair Housing Act, and Fred Keller was not. When the district court concluded after this briefing that "each Plaintiff has standing to assert the claims presented by that Plaintiff," *Keller v. City of Fremont*, 853 F. Supp. 2d 959, 966-67 n.2 (D. Neb. 2012), the district court presumably meant only that Keller had standing to raise his claims

-27-

under the Supremacy Clause and the Commerce Clause, as presented in the brief of the Keller Plaintiffs. The court's reference to the "Plaintiffs in the Keller case" during its discussion of the Fair Housing Act, *id*. at 978, is naturally understood to mean those plaintiffs who asserted standing to raise a claim under the FHA (*i.e.*, Juan Doe and Juana Doe #2), not Fred Keller.

In any event, the City also argued on appeal that none of the Keller Plaintiffs has standing to raise a claim under the FHA. As in the district court, the Keller Plaintiffs responded by arguing only that Juan Doe and Juana Doe #2 have standing. They advance no argument that Fred Keller is pressing a claim under the FHA or that he has standing to do so. Fred Keller thus has abandoned any claim under the FHA that might have been pleaded in the amended complaint. As such, it is unnecessary to address whether Keller would have standing to raise a pre-enforcement challenge that Ordinance No. 5165 violates the FHA while at the same time averring that he will never be subject to the Ordinance. *Cf. ante*, at 20 & n.11.

The district court concluded summarily that Juan Doe and Juana Doe #2 have standing to bring a claim under the FHA, but neither has alleged a sufficient injury to satisfy Article III. Article III requires an injury that is "concrete, particularized, and actual or imminent," *Clapper v. Amnesty International, USA*, 133 S. Ct. 1138, 1147 (2013), and the allegations of injury made by Juan and Juana do not meet that standard.

Juan Doe testified at deposition that he and his wife had lived in their current rental unit for four years, and that they intended to reside there "for a long time." Supp. SA 8. The Ordinance does not apply to rentals in effect before the Ordinance was enacted. Ord. 5165, § 1.2(A)(3). As long as Juan and his wife remain at their current residence, they will not be subject to the Ordinance and will suffer no injury. Juan attempted to establish injury by submitting a post-deposition affidavit that said he was "currently looking to rent a house," but this court has held that a party who

has been examined at length on deposition cannot raise a genuine issue of fact "simply by submitting an affidavit contradicting his own earlier testimony." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983). Even accepting Juan's affidavit, moreover, merely "looking to rent" is insufficient to demonstrate an *imminent* harm when the record shows that Juan had not moved to a new residence within six months of filing the affidavit.

Juana Doe #2 alleged no injury in fact, because after this case commenced, she moved from a rental unit into a trailer home that she purchased, and she then testified that she plans to live at the trailer home "indefinitely." Juana's general statement that she "would prefer to give her son a more comfortable living situation" is insufficient to establish that the Ordinance will cause an imminent injury by preventing a move to rental housing, especially since Juana acknowledged that she was unable to rent a more desirable apartment in Fremont even before the Ordinance went into effect. "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of" an actual or imminent injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 & n.2 (1992).

In sum, Juan Doe and Juana Doe #2 lack standing to raise a claim under the Fair Housing Act, and Fred Keller has abandoned any claim that he might have pleaded under the FHA. It is thus unnecessary to reach the merits of a disparate impact challenge to the Ordinance under the Fair Housing Act. For these reasons, I concur in part in the opinion of the court and concur in the judgment.

BRIGHT, Circuit Judge, dissenting.

The city of Fremont, Nebraska enacted a housing ordinance with the purpose of removing "illegal aliens," or undocumented persons,[13] from the city. Fremont seeks to usurp power reserved to the federal government by identifying undocumented persons and forcing them out of the city, and perhaps the country. The federal government has the exclusive authority to determine which immigrants may reside in this country and which immigrants will be removed. Fremont may not exercise this power, even within its own boundaries. Neither Fremont nor any other city in this nation may enact a system of regulation designed to remove presently undocumented immigrants. Sections 2, 3, and 4 of Ordinance 5156 ("the Ordinance") are conflict preempted because they stand as an obstacle to a federal objective. I strongly dissent.

In June 2010, the voters of Fremont adopted the Ordinance by public initiative. The heart of the Ordinance is the prohibition of harboring. The Ordinance declares that it is unlawful for any person or business entity to harbor an undocumented person. The Ordinance further explains that knowingly renting a dwelling to an undocumented person constitutes harboring. Any undocumented person who rents a dwelling in Fremont is deemed to have breached a condition of their lease.[14] As the sponsors of the Ordinance noted, the Ordinance is designed to prevent undocumented persons from renting, and thus living, in Fremont.

---

[13] Although the Ordinance uses the term "illegal alien" to describe persons unlawfully present in the United States, in this dissent I refer to such persons by the term "undocumented person."

[14] The Ordinance will apply only prospectively and will not affect undocumented persons with existing leases, until they try to move to a new unit or dwelling.

-30-

Sections 3 and 4 of the Ordinance create an occupancy license system to enforce the harboring prohibition. Every prospective renter in Fremont must obtain an occupancy license before the renter may occupy a rented dwelling. This involves submitting an application for the license, and $5, to the Fremont Police Department. The application will request basic information, such as name, date of birth, the address of the dwelling, and "country or citizenship." Additionally, applicants will be required to either (1) declare that they are a United States citizen or national; (2) provide an identification number establishing their lawful presence; or (3) declare they do not know of any such identification number establishing their lawful presence. This is an effective means to identify and deter undocumented persons from living in Fremont. Few, if any, undocumented persons will fill out and sign an application which requires them to disclose their undocumented status.

An undocumented person who declares his or her unlawful presence would receive an occupancy license immediately upon completing the application and could then begin occupancy of the rented dwelling. However, the process will not end here. After issuing an occupancy license to an undocumented person, the Fremont Police Department will submit the person's information to the federal government "to ascertain whether the occupant is an alien lawfully present in the United States." This reporting of unlawful presence to the federal government is an additional deterrent to undocumented persons obtaining housing in Fremont.

When the federal government reports to Fremont that an undocumented person is indeed unlawfully present,[15] the Police Department will issue the person a deficiency notice, wait 60 days to allow the person to correct the federal government's information and prove their lawful presence, and check again after 60

---

[15]The Police Department may not take action if the federal government's ascertainment of the person's status is inconclusive or tentative and must instead wait for a "final ascertainment." The Police Department may not attempt to independently verify an undocumented person's status.

days have elapsed. If the federal government again responds that the undocumented person is unlawfully present, the Police Department will then issue a revocation notice. This notice provides for revocation of the person's occupancy license after 45 days. Under this process, an undocumented person's occupancy will rest on uncertainty for a lengthy period.

Even if an undocumented person would hazard applying for an occupancy license, under the Ordinance this person's license will inevitably be revoked. And in the process, that person will be reported to federal authorities. This is how the Ordinance will keep undocumented persons out of Fremont—either they will be deterred from attempting to rent dwellings or they will have their occupancy licenses revoked and be forced to leave. The Ordinance prevents undocumented persons from renting in Fremont, which is tantamount to preventing them from living in the city at all.[16]

The district court concluded that several parts of the Ordinance are conflict preempted. *Keller v. City of Fremont*, 853 F. Supp. 2d 959, 972-73 (D. Neb. 2012). In reaching this conclusion, the court noted two important facts. First, Congress created the INA, a complex scheme for adjudicating immigrants' right to remain in the country. *Id.* at 972. The INA and other federal regulations provide the structure for the classification and removal of undocumented persons. *Id.* at 973. Second, persons who enter the United States illegally and remain here unlawfully are nonetheless often allowed to stay in the United States pending adjudication of their status and they may eventually be granted a legal status. *Id.* at 972.

---

[16]Moreover, the Ordinance creates problems for all landlords and potential tenants by complicating the process of obtaining rental housing. If the Ordinance goes into effect, landlords may try to limit their risk of liability for harboring by finding reasons not to rent to any person they suspect to be undocumented.

The district court concluded that sections 2, 3(L), and 4(D) are conflict preempted because they present an obstacle to the accomplishment of a federal objective. *Id.* at 972-73. The district court isolated these sections because they "prohibit[] the harboring of illegal aliens, and provid[e] for the revocation of occupancy licenses and for certain penalties following such revocation." *Id.* at 973. The court reasoned that these penalty provisions remove undocumented persons from Fremont, and "[i]f states or political subdivisions take independent action to remove aliens from their jurisdiction, essentially forcing them from one state or community to another where their identity and whereabouts may be obscured, the structure Congress has established for the classification, adjudication, and potential removal of aliens will be impaired." *Id.* at 973.

We must consider whether the Ordinance "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). The majority concludes that the Ordinance does not directly remove undocumented persons from Fremont, and thus the Ordinance does not conflict with the federal removal power. I disagree with the majority on this matter of judgment. I would affirm the district court's application of conflict preemption. However, this district court did not go far enough. I would determine that all of sections 2, 3, and 4 are preempted because they are an obstacle to the comprehensive federal system of removal and the uniform enforcement of immigration law. The conclusion that the housing provisions of the Ordinance are conflict preempted is supported by three of our sister circuits—every circuit yet to speak on this issue. *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (Apr. 29, 2013); *Villas at Parkside Partners v. City of Farmers Branch*, 675 F.3d 802 (5th Cir.), *vacated for reh'g en banc*, 688 F.3d 801 (5th Cir. 2012); *Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010), *vacated and remanded for further consideration*, 131 S. Ct. 2958 (2011).

The Third Circuit addressed an identical harboring prohibition in *Lozano*. 620 F.3d at 179. Hazleton, Pennsylvania enacted an ordinance making it " 'unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law.' " *Id.* This is word-for-word the same language used in Fremont's harboring provision. Hazleton's harboring prohibition was also enforced through a system of occupancy permits, and the Hazleton ordinance required prospective renters to prove their citizenship or lawful residency to obtain a permit. *Id.* at 180. The *Lozano* plaintiffs sued to enjoin the Hazleton ordinance pre-enforcement, as a facial challenge. *Id.* at 181.

The Third Circuit concluded that "[t]hrough its housing provisions, Hazleton attempts to regulate residence based solely on immigration status." *Id.* at 220. The court also determined that the Hazleton ordinance was "in essence" about removal of undocumented persons from the city, because " '[i]t is difficult to conceive of a more effective method' of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it." *Id.* at 220-21 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160 (1989)). "[I]t appears plain that the purpose of these housing provisions is to ensure that aliens lacking legal immigration status reside somewhere other than Hazleton." *Id.* at 224.

The Third Circuit held that the housing provisions were conflict preempted[17] because they attempted to remove undocumented persons from the city "based on a snapshot of their current immigration status, rather than based on a federal order of removal." *Id.* at 221. This produces conflict with federal law because unlawful presence or undocumented status is not in every case equivalent with removability or with eventual removal. "Under federal law, an unlawful immigration status does not lead instantly, or inevitably, to removal." *Id.* Additionally, undocumented persons are afforded numerous procedural protections under federal law before an order of removal may issue. *See id.* at 197. The federal government will sometimes exercise its discretion not to prosecute a removal, "thereby tacitly allow[ing] the presence of those whose technical status remains 'illegal.' " *Id.* at 222. Even once a removal proceeding is commenced, it is far from certain it will result in removal.[18] *Id.* Therefore, removing an undocumented person from a city based on a current unlawful status, exhibits "either a lack of understanding or a refusal to recognize the complexities of federal immigration law." *Id.* The Hazleton ordinance would have removed undocumented persons from the city without affording them any procedural protections and even if the federal government would permit those persons to remain.

---

[17]The Supreme Court vacated and remanded *Lozano* for further consideration in light of its opinion in *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011*). City of Hazleton v. Lozano*, 131 S. Ct. 2958 (2011). *Whiting* concerned an Arizona law regulating the employment of undocumented persons, but did not involve the issue of harboring or housing regulations. The Supreme Court gave no direction on remand regarding *Lozano*'s holdings on harboring. Therefore, these holdings may survive the Third Circuit's reconsideration.

[18]At the conclusion of a removal hearing, the immigration judge may decide that the undocumented person is not removable. *Lozano*, 620 F.3d at 197 (citing 8 U.S.C. § 1229a(c)(1)(A)). Even if the immigration judge determines the undocumented person is removable, the judge may grant relief in the form of postponement of removal, cancellation of removal, or even adjustment of status to that of a lawful permanent resident. *Id.* (citing 8 U.S.C. §§ 1229a(c)(4), 1229b).

Based in part[19] on this conflict with federal law, the court upheld a permanent injunction against enforcement of the Hazleton housing provisions. *Id.* at 224.

Next, the Fifth Circuit addressed a housing ordinance nearly identical to Fremont's in *Farmers Branch*.[20] 675 F.3d at 804. The Farmers Branch ordinance similarly would have required prospective renters in the city to apply for an occupancy license. *Id.* Just as in Fremont, undocumented applicants for this license would have been required to declare that they lack knowledge of any identification number establishing their lawful presence. *Id.* Just as in Fremont, such a declaration would prompt the city to verify the applicant's immigration status with the federal government and would eventually lead to a revocation of the license for all undocumented persons. *Id.* The Farmers Branch ordinance was also challenged on its face, pre-enforcement. *Id.* at 806.

The Fifth Circuit panel opinion concluded that "[t]he removal of illegal immigrants is thus the precise and intended effect of the Ordinance." *Id.* at 810. Based on this effect of removal, the court held that the ordinance was conflict preempted.[21] *Id.* at 817. The court reasoned that Farmers Branch sought to remove undocumented persons by compelling their departure from the city, thereby setting its own immigration policy. *Id.* at 813. The Farmers Branch ordinance thus "threatens the careful balance that the federal government must maintain in foreign

---

[19]The court also concluded that the housing provisions are unconstitutional regulations of immigration and are field preempted by the INA. *Id.* at 220-21.

[20]The Fifth Circuit granted rehearing en banc in *Farmers Branch*. *Villas at Parkside Partners v. City of Farmers Branch,* 688 F.3d 801 (5th Cir. 2012). No en banc opinion has yet issued. I discuss the case here because the reasoning of Judge Reavley's opinion for the panel is logical and persuasive.

[21]The court also held that the ordinance preempted as a regulation of immigration. *Farmers Branch*, 675 F.3d at 811.

affairs and impedes the federal prerogative for deciding how to treat illegal immigrants." *Id.* at 815. The Fifth Circuit affirmed the permanent injunction against the ordinance, in part because it stood as "an obstacle to federal authority over immigration and the conduct of foreign affairs." *Id.* at 817.

Most recently, the Eleventh Circuit addressed a similar ordinance in *United States v. Alabama*.[22] 691 F.3d 1269. Although many provisions of the Alabama law were challenged, two are relevant here. First, section 13 created a state crime for harboring an undocumented person, which included renting a dwelling to an undocumented person. *Id.* at 1277. Second, section 27 prohibited, with limited exceptions, the enforcement of any contract entered by an undocumented person. *Id.* at 1278. Both sections, challenged on their face pre-enforcement, were deemed preempted. *Id.* at 1287, 1296. The court first determined that section 13 was both field and conflict preempted. *Id.* at 1287-88. The court explained that "section 13 undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration." *Id.* at 1287. Furthermore, the court found that the rental prohibition in section 13 "effectuates an untenable expansion of the federal harboring provision." *Id.* at 1288. Ultimately, the court determined that section 13 was conflict preempted because it mandated enforcement of additional regulations not contemplated by the INA. *Id.*

The Eleventh Circuit also found section 27 preempted. *Id.* at 1296. Notably, the court stated that section 27 would remove undocumented persons from Alabama, thus exercising an exclusively federal power. *Id.* at 1293. The court was "convinced that Alabama has crafted a calculated policy of expulsion, seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294. This, the court concluded, Alabama cannot do. "[T]he expulsion power

---

[22]The Supreme Court recently denied a writ of certiorari in *Alabama*. 133 S. Ct. 2022.

Alabama seeks to exercise through section 27 conflicts with Congress's comprehensive statutory framework governing alien removal." *Id.* Removal of undocumented persons by the state of Alabama conflicts with federal law because it gives no "regard for any of the statutory processes or avenues for granting an alien permission to remain lawfully within the country." *Id.* at 1295. Furthermore, a state law which removes undocumented persons from that state conflicts with a federal objective because "Congress intends the Executive Branch to retain discretion over expulsion decisions and applications for relief." *Id.* Ultimately, the court held that section 27 was preempted because only the federal government may determine who must be removed and who may remain. *Id.* A state or locality may not "unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory." *Id.*

*Arizona v. United States*, 132 S. Ct. 2492 (2012) also supports this dissent. *Arizona* reaffirmed basic principles of immigration law. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Id.* at 2498. Only the federal government may determine the immigration policy of our nation and states may not enact legislation designed to achieve their own immigration policy. *Id.* at 2498, 2506. One important aspect of immigration law and policy entrusted to the federal government alone is the power to control the removal of persons from the United States: "[T]he removal process is entrusted to the discretion of the Federal Government." *Id.* at 2506. *Arizona* also emphasized the need for a uniform, national voice on immigration policy, particularly on issues of removal. Decisions about removability "touch on foreign relations and must be made with one voice." *Id.* at 2506-07.

Based on these principles, the Supreme Court struck down three of the four challenged provisions of the Arizona law. Two of the provisions, sections 5(C) and 6, were struck down based on conflict preemption. Section 5(C) made it a state misdemeanor crime for "unauthorized aliens" to apply for work in Arizona. *Id.* at

2503. The Court concluded that although section 5(C) pursued a common goal with federal law—the deterrence of unlawful employment—there was a conflict in the method of enforcement. *Id.* at 2505. The Court determined that Congress had chosen not to impose criminal penalties on undocumented persons who engage in unauthorized employment—there was no federal counterpart to section 5(C). *Id.* at 2503-05. This section was conflict preempted because Arizona chose a contrary enforcement mechanism, creating "an obstacle to the regulatory system Congress chose." *Id.* at 2505.

The Supreme Court also found section 6 conflict preempted. *Id.* at 2507. Section 6 provided for warrantless arrests where an officer had probable cause to believe the arrestee was removable. *Id.* at 2505. The Court found this section in conflict with federal law because it gave state law enforcement officers greater authority to arrest than Congress gave federal immigration officers. *Id.* at 2506. "This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case." *Id.* Permitting such a marked difference from federal law would have allowed Arizona to achieve its own immigration policy. *Id.* Although section 6 did not directly remove any undocumented person from the state, the mere fact that it touched on the federal removal process created a conflict. Giving state officers the power to decide whether a person could be detained for being removable "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.*

These two provisions of the Arizona law were facially conflict preempted, before the law was ever enforced. Although the Court recognized that "a basic uncertainty about what [a] law means and how it will be enforced" may caution against finding conflict preemption at the pre-enforcement stage, *id.* at 2510, the Court also implicitly recognized that where the effect of a law and the conflict with federal law is certain, pre-enforcement conflict preemption is entirely appropriate. This was the case with sections 5(C) and 6 of the Arizona law. A court may perhaps

refrain from finding conflict preemption where it would need to assume that a law will be construed in a way that creates a conflict. But this sort of assumption is not necessary in all cases of pre-enforcement conflict analysis. By striking down two sections of the Arizona law on conflict grounds, the Supreme Court confirmed that a certainty in conflict permits a court to find conflict preemption at the pre-enforcement stage.

There is no uncertainty about the effect of the Ordinance and no need to make assumptions or speculate about how it will be implemented. Just as in *Arizona*, the effect of the Ordinance, and thus the grounds for conflict, are entirely clear pre-enforcement. The purpose and effect of the Fremont ordinance is exclusion and removal of undocumented persons.[23] Like the contracting provision in *Alabama*, the Fremont ordinance seeks to make life so difficult for undocumented persons that they must retreat. The Ordinance leaves undocumented persons with no realistic way to attain housing. "The undeniable practical effect of the Ordinance is thus to compel the departure of aliens from the City to other cities, states, or foreign countries." *Farmers Branch*, 675 F.3d at 813.

The federal government exercises complete and exclusive control over the removal of undocumented persons. Fremont may not usurp this power by removing undocumented persons from its boundaries. "To be meaningful, the federal government's exclusive control over residence in this country must extend to any political subdivision." *Lozano*, 620 F.3d at 221. *Arizona* emphasized the importance of removal decisions and the national imperative that they be made with one voice. 132 S. Ct. at 2506-07. Although section 6 of the Arizona law did not directly remove

_____

[23]The majority disputes that the Ordinance effects any direct removal of undocumented persons. But this is undoubtedly the purpose of the Ordinance and will be its result. " 'It is difficult to conceive of a more effective method' of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it." *Lozano*, 620 F.3d at 220-21.

any undocumented persons from the state—it allowed state officers to detain an undocumented person for being removable—the Supreme Court found it preempted because it was related to removal. *Id.* The Fremont ordinance has a much closer relationship to removal than did section 6. So it, too, "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 2506. If the more remote connection between section 6 and removal is enough to trigger conflict preemption, the same must be true of the Ordinance.

The Ordinance creates an obstacle to the accomplishment of a federal objective because it interferes with the comprehensive federal system of adjudication and removal of undocumented persons. Like section 5(C) in *Arizona*, the Ordinance is "an obstacle to the regulatory system Congress chose." 132 S. Ct. at 2505. "[I]t is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens." *Mathews v. Diaz*, 426 U.S. 67, 84 (1976). Any action by a state or locality to remove undocumented persons interferes with the exclusive power of the federal government over removal. Fremont may not "unilaterally determine that any alien unlawfully present in the United States cannot live within the [city's] territory." *Alabama,* 691 F.3d at 1295.

Illegal immigration and the residence of undocumented persons in the United States is a national issue. "[T]he treatment of aliens entails issues of national concern that reach beyond parochial concerns of individual states." *Farmers Branch*, 675 F.3d at 814. States and cities "may have understandable frustrations with the problems caused by illegal immigration," but they "may not pursue policies that undermine federal law." *Arizona*, 132 S. Ct. at 2510. "Legal imposition of distinct, unusual, and extraordinary burdens and obligations on aliens…bears an inseparable relationship to the welfare and tranquility of all the states, and not merely to the welfare and tranquility of one." *Hines*, 312 U.S. at 65-66.

The Ordinance will impose a distinct burden on undocumented persons by preventing them from renting housing in Fremont. This denial of rental housing is paramount to removal from the city. And, as the Supreme Court has made clear, removal is entrusted exclusively to the federal government. Therefore, the Ordinance poses an obstacle to the accomplishment of a federal objective, and it should be enjoined based on conflict preemption.

_____