REAVLEY, Circuit Judge,
joined by GRAVES, Circuit Judge, concurring only in the judgment:
Farmers Branch requires owners of residential property in the city to lease their property only to people who are lawfully present in the United States.[1] City officials explained that the problem was the Latino population and never mentioned any housing problem,[2] and the City contends that it may deny housing for illegal aliens whether or not they are removable from the country under the federal law. The City may think its ordinance serves the public welfare and is a legitimate exercise of its police power, and my colleagues apparently agree with this, but under Supreme Court holdings the national law of immigration and the control of foreign affairs preempts what Farmers Branch has done.
The Constitution unites the states to better serve the common good and protect revered rights. The Supreme Court in Arizona v. United States, — U.S.-, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), applied the Constitution as giving exclusive effect to national control of immigration and foreign affairs. Judges who approve any part of this ordinance evade that national authority. They do so by treating it as a mere housing regulation and by ignoring its purpose and effect: the exclusion of Latinos from the city of Farmers Branch. The record leaves no doubt of this.
Preliminarily, I question whether this ordinance qualifies to be called an exercise of police power, because it cannot be said “to promote the safety, peace, public health, convenience and good order of its people.”[3] City of Birmingham v. Monk, 185 F.2d 859, 861-62 (5th Cir.1950). But the police power is not above the Constitution. Id.; see also Ga. Latino Alliance for Human Rights v. Governor of Ga., 691 F.3d 1250, 1265 n. 11 (11th Cir.2012) (“[Legislation in a field where states traditionally have power does not defeat a *540 claim of federal preemption.”). The Court has often stated that a state law is preempted by the Supremacy Clause where it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Arizona, 132 S.Ct. at 2501; Hines v. Davidowitz, 312 U.S. 52, 67-68, 61 S.Ct. 399, 85 L.Ed. 581 (1941).
Whether the Farmers Branch ordinance is preempted as an obstacle to the purposes and objectives of Congress in the field of immigration is a “matter of judgment” informed by the federal scheme and the purpose and effects of the federal statute as a whole. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352 (2000). We must therefore consider Congress’s objectives in the Immigration and Nationality Act (INA), where the “[fjederal governance of immigration and alien status is extensive and complex.” Arizona, 132 S.Ct. at 2499; see also Chamber of Commerce of U.S. v. Whiting, — U.S.-, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011) (stating that with the INA Congress “established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country” (internal quotation marks and citation omitted)). Congress has extensively determined which aliens may be admitted to this country, which aliens should be removed, and the process for both admission and removal. Arizona, 132 S.Ct. at 2499.
For example, the INA creates multiple categories of aliens subject to removal, and it provides for the expedited removal of certain aliens. 8 U.S.C. §§ 1227-28. It also expressly grants discretion for the Attorney General to waive removal under certain circumstances, such as for humanitarian purposes or for victims of domestic abuse. See, e.g., id. § 1227(a)(1)(E)(iii) & (a)(7). It further sets out the procedures for adjudicating an alien’s status before an immigration judge, and it specifies that those procedures are the exclusive means for determining the removability of an alien. Id. § 1229a(a)(3). Moreover, the federal scheme contains various provisions under which aliens who have come to the United States unlawfully may be permitted to remain here, including asylum, id. § 1158, cancellation of removal, id. § 1229b, withholding of removal, id. § 1231(b)(3), and temporary protected status, id. § 1254a. In light of this comprehensive statutory framework, “the removal process is entrusted to the discretion of the Federal Government.” Arizona, 132 S.Ct. at 2506; see also Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) (“Policies pertaining to the entry of aliens and their right to remain here are ... entrusted exclusively to Congress[J”). When set against the extensive federal scheme and its discretionary allowances, the Farmers Branch ordinance interferes with Congress’s objectives and regulation of immigration. See id. at 2506-07.
First, the premise of the ordinance, as argued in the City’s brief, is that any non-citizen “unlawfully” present in Farmers Branch has no legal right to be present anywhere in the United States, and therefore the ordinance may criminalize the continued presence of such persons within rental housing in the City. The premise is a false one, however, because “[a]s a general rule, it is not a crime for a removable alien to remain present in the United States.” Arizona, 132 S.Ct. at 2505. For this reason, the Court held that Arizona could not authorize the arrest of persons thought probably to be illegal aliens because the state may not regulate the presence of removable aliens.
*541 Second, the ordinance does more than merely deter the presence of Latinos from Farmers Branch, and instead works to exclude and remove aliens from the City’s borders. This is because no alien with an unlawful status will be able to obtain the basic need of shelter through a rental contract. Illegal aliens will therefore have no recourse but to self-deport from Farmers Branch. See Lozano v. City of Hazleton, 620 F.3d 170, 220-21 (3d Cir.2010) (“It is difficult to conceive of a more effective method of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it.” (internal quotation marks and citation omitted)), vacated on other grounds by — U.S.-, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011). This forced migration of illegal aliens conflicts with the careful scheme created by the INA and burdens the national prerogative to decide which aliens may live in this country and which illegal aliens should be removed.
It is said that the ordinance is permissible as regulation of employment was permissible in DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). But neither my position nor that of the Supreme Court conflict with DeCanas. The California statute there was directed at an acute economic problem that left many citizens unemployed. The Court held that the state’s police power justified the legal priority for their employment to go ahead of people unlawfully present. The police power is not so clear here, and the immigration conflict did not exist there.
The Eleventh Circuit reached a similar conclusion when it recently considered a provision of an Alabama law that prohibited the recognition of contracts entered into by unlawful aliens. United States v. Alabama, 691 F.3d 1269, 1292-95 (11th Cir.2012), cert. denied, — U.S.-, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013). Because the law essentially prevented aliens “from enforcing contracts for basic necessities” in derogation of the ability to live and conduct daily affairs, the court concluded that the measure’s effect of forcing undocumented aliens out of the state interfered with the exclusive federal power to expel aliens, as well as with the INA’s comprehensive scheme governing the removal of aliens. Id. at 1293-94. The Farmers Branch ordinance is just as invidious because its adverse effect on housing also precludes aliens from obtaining an essential human requirement. Cf. id. at 1299 n. 25 (recognizing that depriving aliens of “basic needs, such as water, garbage, and sewer services ... amounted to an impermissible policy of expulsion”). Farmers Branch, like Alabama, “has essentially decided that unlawfully present aliens cannot be tolerated within its territory, without regard for any of the statutory processes or avenues for granting an alien permission to remain lawfully within the country.”[4] Id. at 1295.
By effectively removing illegal immigrants from the City, Farmers Branch also interferes with the national power to control and conduct relations with foreign nations. This concern about the relationship between immigration and foreign affairs, and the exclusivity of the national power, often has been stated by the Supreme *542 Court. See, e.g., Arizona, 132 S.Ct. at 2498-99; see also Toll v. Moreno, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982) (noting that federal authority over “the status of aliens derives from multiple constitutional sources, including the Federal Government’s power ‘[t]o establish [a] uniform Rule of Naturalization,’ ... its power ‘[t]o regulate Commerce with foreign Nations,’ ... and its broad authority over foreign affairs” (alterations in original) (citations omitted)); Plyler v. Doe, 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786 (1982) (“With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation. No State may independently exercise a like power.”); id. at 237 n. 1, 102 S.Ct. at 2405 n. 1 (Powell, J., concurring) (“Given that the States’ power to regulate in this area is so limited, and that this is an area of such peculiarly strong federal authority, the necessity of federal leadership seems evident.”); Harisiades v. Shaughnessy, 342 U.S. 580, 588-589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952) (“It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.”); Hines, 312 U.S. at 64, 61 S.Ct. at 402; Chy Lung v. Freeman, 92 U.S. 275, 279, 23 L.Ed. 550 (1875) (“If th[e] government [of California] should get into a difficulty [because of its treatment of noncitizens] which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?”).
The Arizona opinion opens by emphasizing the “broad, undoubted” federal power “over the subject of immigration and the status of aliens,” and the “inherent power as sovereign to control and conduct relations with foreign nations.” Arizona, 132 S.Ct. at 2498. The Court gives a full description of the importance of how this nation treats the nationals of foreign countries when they are in this country because “perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad.” Id.; see also Hines, 312 U.S. at 64, 61 S.Ct. at 402 (“One of the most important and delicate of all international relationships ... has to do with the protection of the just rights of a country’s own nationals when those nationals are in another country.”). In light of the potential ramifications of the treatment of aliens in this country, “Congress,” not the states, “specifie[s] which aliens may be removed from the United States and the procedures for doing so.” Arizona, 132 S.Ct. at 2499. Of paramount importance to the federal scheme “is the broad discretion exercised by immigration officials” because “aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal.” Id. The discretionary decision on removal involves many factors, including the “equities of an individual case ..., including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service,” as well as “policy choices that bear on this Nation’s international relations.” Id. Therefore, “[t]he dynamic nature of relations with other countries requires the Executive Branch,” not the states, “to ensure that enforcement policies are consistent with this nation’s foreign policy with respect to these and other realities.” Id.
The Court wrote this as a crucial part of its formal legal analysis, but it is ignored *543 by the dissenters. The Court went on later to address the federal government’s discretion over the removal process as “embracing immediate human concerns” that will affect whether an alien should be permitted to remain in this country. Id.
“Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime.” Id. Other “discretionary decisions involve policy choices that bear on this Nation’s international relations,” including whether to return an alien to a foreign state “mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return.” Id. Given the complexity and the myriad factors that go into the removal decision, it is clear that “foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.” Id. at 2498.
Farmers Branch expressly singled out those aliens who cannot show or honestly state their lawful residence, and imposed a burden on landlords and realtors that can be avoided by them simply choosing not to deal with Latino people when they have an alternative. This ordinance is surely offensive to immigrants and to our neighbors to the south. My colleagues are completely silent about this.
Congress’s framework for removal provided in the INA and the discretion allowed by that framework show that Congress has occupied the field of alien removal. The Farmers Branch ordinance ignores the practical reality of the federal government’s control of the removal process, however, and simply requires illegal immigrants to remove themselves from the city’s borders. But “[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice.” Id. at 2506-07 (emphasis added).
The Farmers Branch ordinance is but one example of a trend in this country of states and localities attempting to take immigration matters into their own hands. This trend to single out illegal immigrants for adverse treatment is reminiscent of the “anti-Japanese fever” that existed in the 1940s. See Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 422, 68 S.Ct. 1138, 1144, 92 L.Ed. 1478 (1948) (Murphy, J., concurring). As so powerfully articulated in Justice Murphy’s concurrence in Takahashi, “[l]egislation of that type is not entitled to wear the cloak of constitutionality.” Id.
With the support now of the Supreme Court in the Arizona decision, as well as the Eleventh Circuit in Alabama, I repeat what the panel said about the Farmers Branch ordinance: Because the sole purpose and effect of this ordinance is to target the presence of illegal aliens within the city of Farmers Branch and to cause their removal, it contravenes the federal government’s exclusive authority on the regulation of immigration and the conditions of residence in this country, and it constitutes an obstacle to federal authority over immigration and the conduct of foreign affairs.

. The dissent suggests that the City's issuance of an occupancy license is non-discretionary insofar as the license is "automatically” issued and there is no affirmative obligation to declare one’s lawful presence in the United States before receiving the license. This view mischaracterizes the operation of the City's regulation and its onerous results. The Ordinance demands that failure to declare either United States citizenship or a federal number that establishes "lawful presence” will trigger a process more likely than not leading the building inspector to revoke the license. See, e.g., Farmers Branch, Tex., Ordinance 2952 § 1(B) & (D).

. See the panel opinion: 675 3d 802, 805-06, 809-10 (5th Cir.2012).

. As noted in the panel opinion:
[T]he City points to nothing showing an effect on public welfare by illegal aliens’ occupancy of rental housing. The mayor of Farmers Branch confirmed that the City conducted no studies on the effects of undocumented aliens on the value of property in Farmers Branch, the quality of its schools, the crime rate, or the availability of healthcare to its residents. One City Council member, Gary Greer, testified that there was no data showing whether undocumented immigrants commit more crimes than others in Farmers Branch. Still another council member, David Koch, agreed that the Ordinance was "not directed in any way towards revitalization” but rather was "directed solely towards removing illegal immigrants.”
675 F.3d at 810.

. The dissent concludes that the Ordinance does not "effect or affect” aliens’ removal. This view is similar to that of two judges on the Eighth Circuit, see Keller v. City of Fremont, 719 F.3d 931, 941, 2013 WL 3242111, at *5 (8th Cir. June. 28 2013), but it is contrary to the conclusion reached by both the Third Circuit in Lozano and the Eleventh Circuit in Alabama when considering similar laws, and it is blind to the reality of what this ordinance does. As noted by Judge Bright in Keller, there can be no doubt that "[t]he purpose and effect of the ... ordinance is exclusion and removal of undocumented persons.” Keller, 719 F.3d at 958, 2013 WL 3242111, at *22 (Bright, J., dissenting).